[Civil No. 4254. Filed December 9, 1940.]

[107 Pac. (2d) 1078.]

STATE OF ARIZONA ex Rel. ANA FROHMILLER, State Auditor, Appellant, v. HERMAN E. HENDRIX, Superintendent of Public Instruction, and CLINTON E. MANGUN, Appellees.

344

Mr. P. H. Brooks, for Appellant.

Messrs. Snell & Strouss and Mr. Mark Wilmer, for Appellee Hendrix.

Mr. Theodore G. McKesson, for Appellee Mangun.

ROSS, C. J.—The question we have to decide is whether the legislature has authorized and empowered the plaintiff, state auditor, to audit the books, accounts and records of the board of education as kept by its secretary, the superintendent of public instruction, pertaining to the purchase and distribution of free textbooks for the common schools and other named institutions of the state.

Plaintiff alleges in her complaint, in substance, that approximately $375,000 have been expended in the purchase and distribution throughout the state of such free textbooks since January, 1933; that under agreements of the publishers from whom such books were purchased there was refunded 10 per cent. of the $375,000 and that there had been paid back to the state only $5,000, leaving $32,500 unaccounted for.

Defendants Hendrix and Mangun filed separate answers denying, in effect, that the records, accounts and books reflecting the disposition of the 10 per cent. re-

fund were public, the defendant Mangun alleging in his answer that such records, accounts and books pertained to his personal affairs and business and were not subject to audit by the plaintiff.

The trial court, after receiving oral and documentary evidence, decided the issues in favor of the defendants and refused to grant a *mandamus* to compel defendants to deliver such records to the plaintiff for audit. Plaintiff has appealed.

To a proper understanding, it will be necessary that we state the law governing the furnishing of free textbooks, the course of conduct of the parties thereunder, and how Mangun gets into the picture.

Section 1048, Revised Code of 1928, as amended by chapter 20, Laws of 1933, provides that the state shall furnish free textbooks for the common schools and for all state welfare institutions maintaining educational facilities, and appropriates to the state board of education out of the state's general funds the necessary costs and contingent expenses therefor. Such section makes it the duty of the several county superintendents to furnish to the secretary of the state board of education, on or before the first day of April in each year, a complete list of the textbooks necessary for the schools of their respective counties, and the secretary of the board of directors of state institutions to furnish such lists for state welfare institutions, and the state board of education to supply the books requested.

Section 1049, Id., makes it the duty of the state superintendent of public instruction to advertise, for thirty days in a daily paper, published in the state capital, for bids for the required number of textbooks.

Section 1050, Id., provides that the state board of education shall enter into contracts with the successful bidders, who shall give bond conditioned for the

faithful performance of their contracts; and section 1051 makes it the duty of the state board of education to distribute to each county superintendent the textbooks required for his county, and provides that the county superintendent shall issue said textbooks to the school trustees in his county.

 Thus it is seen that the law very carefully provides who shall purchase free textbooks and how they shall be purchased and by whom distributed. This method, we take it, is exclusive.

In pursuance of the above statutes, the state superintendent called for bids to furnish textbooks for the common schools of the state, and it appears that thereunder the bids of nineteen publishers were from time to time accepted and thereafter contracts in writing entered into by such publishers and the state board of education. These contracts extend over a period of five to ten years, and when the state superintendent of . public instruction orders any books thereunder the publishers agree to furnish them as required. One of the conditions of the call for bids was that ''All bidders must submit bids per book f. o. b. cars at a central depot Chicago.'' All of the contracts between the publishers and the said board contained a provision that the books would be furnished at prices stated in bid f. o. b. cars at a central depot, Chicago.

 Under these contracts the books became the property of the state when delivered to the carrier at any central depot in Chicago. The state became responsible for transportation charges from point of delivery to point of destination and if the books were lost or destroyed in transit the loss would be the state's. When parties have agreed, as here, that the seller may ship from a central depot in a given city, a delivery by the seller to a carrier at such a depot is a delivery to the buyer and constitutes full perform-

ance of the seller's obligation to make delivery, and in such case the delivery passes the title to the buyer and the risk of loss or injury in transit is on the buyer. 23 R. C. L. 1423, section 248, and cases cited under note 4; section 2822, Revised Code of 1928. That the parties to these contracts recognized this as the law is evidenced by the fact that the contracts themselves contain a provision that the publishers will prepay transportation charges "when requested to do so by proper authority, and to render original receipted bills for the same which bills shall be paid by the state board of education within ninety (90) days thereafter."

If these textbooks belonged to the state, and there can be no question but that they did, it was the duty of the state, by some officer, employee or agent, to receipt for them from the carrier and thereafter distribute them according to law, keeping a record of their disposition and on what account and to whom, also any expense incurred in connection therewith. The records so kept are as much the property of the state as the textbooks themselves.

The call for bids and the arrangement for the care and distribution of the books, we take it, were left by the state board of education entirely to the state superintendent of public instruction. He, in fact, testified that he had custody and control of all the records of the state board of education. Section 4, article XI of the state Constitution, makes such officer a member of the state board of education and its secretary. So, it conclusively appears that it was the duty of the state superintendent, in behalf of the state board, to receive the free textbooks, to attend to their proper distribution and of course to keep any records, books and accounts necessary in that connection.

This was not the way things were done. It seems that a plan was adopted by the parties which

did not conform with the law. As gathered from the evidence and the different contracts, the plan was that there would be established in Phoenix a central joint depository to be kept and operated by the various publishers who were successful bidders, and that the free textbooks of the state, as also books belonging to the publishers not purchased by the state, should be carried in stock in such central joint depository. Here is where Mangun comes into the picture. It was necessary to have a keeper or depositary who should have charge of the books in this depository and look after and attend to their distribution to the superintendents of the different counties of the state and state welfare institutions as requisitioned. This was cared for under the agreement by the state board of education, acting through its secretary, the state superintendent of public instruction, designating Mangun as such depositary, who, it was agreed, should be remunerated for his services by the publishers. Imposed upon Mangun, in addition to receiving and looking after, keeping and distributing the free textbooks of the state, was the function of selling the same kinds of textbooks of the publishers to the general trade. Thus it appears that Mangun was acting in a dual capacity, in one of which he was performing a duty imposed by law upon the state board of education or its secretary, and in the other he was engaged in selling books belonging to the publishers to the general trade.

There was a written contract between the publishers and Mangun and one paragraph thereof, which we take it is common to all the publishers' contracts with the depositary, reads as follows:

"As remuneration for his services the Publisher shall pay to the Depositary a commission in an amount equal to ten per cent. of the amount of the sales, as shown by the quarterly sales report provided for in Section Four. Said commission shall be due and pay-

able when remittance as provided for above is made to the Publisher.''

Under this provision of the contract between the publishers and Mangun, the publishers in fact did not receive 100 per cent. of the price for which they had agreed to sell their books but only 90 per cent. In other words, the publishers agreed to refund to Mangun, the depositary, 10 per cent. of the amount of the sales as remuneration of his services. Stated in another way, the state was paying 10 per cent. more for the free textbooks than it should have paid. We are not deciding whose this 10 per cent. refund was, for the reason that that question is not in this case. However, we may state that on March 5, 1936, the state superintendent of public instruction paid to the state treasurer $5,000, which, according to the latter's receipt, ''represents surplus funds arising from the operation of the Ariz. state textbook depository.'' This was turned into the state by one Ned W. Hill, acting as depositary, and the state superintendent. It also appears that when Hill resigned as depositary there was a balance in the Valley National Bank of $2,158.69, which was turned over to Mangun. This sum was also a surplus arising from the operation of the state textbook depository.

■■ There can be no question but that Mangun represented the state in accepting, keeping and distributing the state's books, also in paying transportation or storage charges thereon. These functions clearly under the law were those of the state board of education and the state superintendent of public instruction. Indeed, until this controversy arose, Mangun was furnished offices in the capitol annex and telephone extension service by the superintendent of public instruction at the expense of the state. If these officers found it necessary to appoint someone

to perform such duties in their place and stead, they had a right to do so and to fix the salary of such appointee. Section 62, Revised Code of 1928, gives them that authority. As an employee of the state, Mangun had no right to accept remuneration from private parties. Money had been appropriated under section 1048, *supra,* for this purpose. Public policy forbids an employee of the state from accepting remuneration for his services from anybody other than the state or ·the department thereof which employs him.

The statutes making it the duty of the state auditor to audit all public accounts relating to contracts of the state and the state's revenues are section 27, Revised Code of 1928, as amended by chapter 31, Laws of 1937, reading:

*"State Auditor's Powers And Duties.* (a) The state auditor shall be the general accountant of the state and keeper of all public account books, voucher documents, and papers relating to the accounts an contracts of the state, and its revenue, debt and fisca! affairs, not required by law to be placed in some othe office or kept by some other person.

"(b) The auditor shall install a uniform system c accounting, carefully audit the accounts of each stat board, commission, and institution, and recommend such changes or improvements in accountancy as he may deem advisable. The officers of all such boards, commissions, and institutions shall comply with his instructions.

"(c) The accounts of each state department and state institution shall be fully audited at least once each fiscal year, and reports of such audits shall be filed with the governor and laid before the legislature by the auditor and the·governor. .. . . ''

and section 36 of said Code, reading as follows:

*"Access to public records and state offices.* The auditor and the treasurer shall have free access to each other's offices for the inspection of all books, ac-

counts and papers of their offices, and free access to all other offices of the state for the inspection of such books, accounts, and papers, as concern any of their duties.''

Under these provisions and under the facts as developed in the trial and those admitted by the parties, we think it was clearly the duty of the state auditor to audit the accounts involved and that the court erred in not granting the writ of *mandamus* as prayed.

The judgment is reversed and the cause remanded, with directions that further proceedings be had in accordance herewith.

McALISTER, J., concurs.

LOCKWOOD, J. (Dissenting).—I dissent. The picture painted in the majority opinion of an employee of the state refusing to permit the auditor to inspect the records which show how he handled funds belonging to the state is, in my opinion, not sustained by a scintilla of evidence, and, on the contrary, is contradicted emphatically by all of the evidence, both oral and documentary. Both defendants have expressed their entire willingness to permit the auditor to examine all of their records which pertain to any property of the state or to any money which at any time belonged to the state, but have declined to permit her to examine private records which all the evidence shows involve private funds.

In order to sustain the majority opinion, we must hold that the auditor, under her power to examine the accounts and records of all public officers, is permitted to indulge in a ''fishing expedition'' in what all of the evidence shows to be purely private accounts, merely because she suspects she might find something indicating that they were, in reality, public in their nature. In a proper suit a bill of discovery may per-

haps permit such action, but certainly it is not allowable in a proceeding of this nature.

The judgment of the lower court should be affirmed.