540 P.2d 197

**Leonard L. O'DAY, dba Leonard O'Day Company, Appellant,**

v.

**GEORGE ARAKELIAN FARMS, INC., Appellee.**

**No. I CA–CIV 2589.**

Court of Appeals of Arizona, Division 1, Department A.

Sept. 25, 1975.

Martori, Meyer, Hendricks & Victor, P. A. by Kenneth R. Reed, Phoenix, for appellant.

Burch, Cracchiolo, Levie, Guyer & Weyl by James B. Crook, Jr., Phoenix for appellee.

OPINION

FROEB, Judge.

This is a suit to recover $22,089.80 for 20 shipments of lettuce over a period of time from November 6, 1970 to February

3, 1971. The factual issues in the case relate to whether Appellee George Arakelian Farms, Inc. (Arakelian) sold and delivered the lettuce to Appellant Leonard L. O'Day (O'Day) or to someone else. The key legal issue is whether there is sufficient evidence of contracts between the parties for the lettuce and of its delivery to and acceptance by the buyer. In considering the latter, we must determine what legal effect is to be given to proof of a prior course of dealings between the parties and whether the buyer is bound by the acts of another by reason of the doctrine of apparent agency.

## THE DEALINGS OF THE PARTIES IN THE PRIOR 55 LETTUCE TRANSACTIONS

There is little dispute in the record as to the 55 prior lettuce transactions which took place between Arakelian and O'Day. They are, respectively, grower and buyer, engaged in the agricultural commodity business. In all instances relevant to the case, O'Day resold the lettuce to his own customers. Between February 27, 1969 and April 13, 1970, William E. Kirchberg (Kirchberg), a food broker, contacted Arakelian and placed 55 orders for lettuce on behalf of O'Day, his principal. As is customary in the business, all orders were verbal, having in these instances been placed over the telephone. The correct quantity of lettuce for each order was shipped by Arakelian to one of several coolers where it was held under cold storage and transferred to a carrier for shipment to one of O'Day's customers at another destination. In each instance, a bill of lading was signed by the carrier in whose hands the shipment was placed. The original and several copies of the bill of lading were then sent to Arakelian where an invoice was prepared for all charges and mailed to O'Day along with a copy of the bill of lading. The invoice showed the lettuce as having been sold to O'Day, the date of shipment, the ultimate destination and the total charge. On the other hand, the bill of lading would give no indication of either O'Day's or Kirchberg's involvement in the transaction. The information it contained showed only that the quantity of lettuce had been loaded aboard and accepted by the particular carrier involved for delivery to its ultimate destination.

All except the last three invoices were paid by checks drawn by O'Day. The last three invoices, though addressed to O'Day, were paid by checks drawn by O. K. Distributors Company, a company owned by Kirchberg. Though this fact is advanced by O'Day as conflicting evidence on the issue of apparent agency between him and Kirchberg, we deem it to be of little significance in the face of notably strong evidence relating to the doctrine of apparent agency.

Arakelian never had dealings directly with O'Day. Each of the 55 orders were placed through Kirchberg.

In July or August, 1970, O'Day and Kirchberg parted company unbeknownst to Arakelian. O'Day did not notify Arakelian of this until Arakelian tried to collect the money from O'Day, well after the 20 lettuce transactions which are at issue here had taken place.

## THE DEALINGS OF THE PARTIES IN THE 20 LETTUCE TRANSACTIONS AT ISSUE HERE

The factual record as to the 20 transactions occurring between November 6, 1970 and February 3, 1971, is sketchy. The only testimony is from Lillian Hodge, office manager of Arakelian, George Arakelian and Daniel K. Arakelian, his son. The documentary evidence is made up almost entirely of office records of Arakelian which include copies of the invoices and bills of lading pertaining to the 20 transactions.

According to the evidence, orders for the 20 lettuce shipments were placed with Arakelian over the telephone by Kirchberg;

instructions were received as to whom the invoices should be sent; the lettuce was, in fact, shipped; the bills of lading were received by Arakelian; invoices were prepared and apparently sent, together with bills of lading, to O'Day at the same address as used in the prior dealings; no invoices were returned undelivered. In general, the evidence showed that the 20 transactions were handled in the same manner as the preceding 55 transactions.

O'Day denies having any connection with the 20 lettuce shipments. He contends that there is no evidence which would support dealings between him and Arakelian, nor any evidence that Kirchberg was his agent in *these* dealings. He argues that there is no evidence of delivery of the 20 shipments either to him or to Kirchberg. He concludes he has no contractual liability for any of the 20 lettuce transactions.

### THE LEGAL ISSUES

The trial court ruled in favor of Arakelian and entered judgment against O'Day for $22,089.80 plus costs. In its judgment, the court found and concluded that Kirchberg had apparent authority to act on behalf of O'Day and bind him to the 20 lettuce sales on the basis of their dealings in the previous 55 transactions. It found that evidence of the previous transactions in which Kirchberg had acted as O'Day's agent constituted apparent authority for him to act in the 20 subsequent transactions. The court then found that the lettuce had been shipped by Arakelian to the cooler where delivery to O'Day was complete. It found that bills of lading confirming the shipments were prepared at the cooler and sent to Arakelian and that in due course an invoice for each shipment was prepared and sent to O'Day and not thereafter returned. The court concluded that each of the 20 oral transactions involved a contract for sale of goods within the Uniform Commercial Code (A.R.S. §§ 44–2305 and 44–2306A) and that the de-

fense of the statute of frauds (A.R.S. § 44–2308) did not apply to these contracts because of the exceptions to the statute in both subsections B and C(3) of A.R.S. § 44–2308. Thus, the trial court found the contracts were enforceable against O'Day.

In our review of the record we find the evidence reasonably supports the judgment of the court and it is therefore affirmed.

The evidence pertaining to the formation of the contracts is clear. Telephone orders were received by Arakelian from Kirchberg. Although there is no evidence that Kirchberg had *actual* authority to bind *these* sales to O'Day, circumstances bringing into effect the doctrine of apparent authority are most certainly present. The principle is set forth in Restatement (Second) of Agency, § 8, as follows:

> Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.

■ Apparent authority may be derived from a course of dealing, or from the fact that a number of acts similar to the ones in question were assented to by the principal. See 3 Am. Jur. 2d, *Agency,* § 74.

■ The manifestations of O'Day in the prior 55 transactions clearly indicate a willingness by him to have Arakelian deal with Kirchberg until Arakelian had notice of termination of authority or until there had been such a lapse of time after the 55 transactions that Arakelian, in the exercise of ordinary prudence, would realize that the authority might no longer exist. As the facts reveal, Arakelian received no such notice and the period of time over which all of the transactions occurred was not so long as to make Arakelian's reliance thereon beyond the exercise of ordinary prudence. Thus, we hold the acts of Kirchberg in these transactions are binding upon O'Day.

We next turn to O'Day's contention that the contracts are not enforceable 'because they were not in writing as required by the statute of frauds. Arizona Revised Statute, § 44–2308, is the statutory provision enacting the statute of frauds in Arizona and reads as follows:

A. Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

B. Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection A against such party unless written notice of objection to its contents is given within ten days after it is received.

C. A contract which does not satisfy the requirements of subsection A but which is valid in other respects is enforceable:

1. If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

2. If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

3. With respect to goods for which payment had been made and accepted or which have been received and accepted (§ 44–2369).

We find the contracts at issue come within the subparagraph C(3) exception to contracts which must be in writing and therefore find it unnecessary to consider the subparagraph B exception. The relevant question here is whether the lettuce was "received and accepted" within the meaning of subparagraph C(3) by O'Day, for if it was, then the oral contracts have been performed by Arakelian and the defense of statute of frauds does not apply. In this case the transfer of the lettuce from the cooler to the motor carrier was the occasion at which the ownership in the lettuce passed from Arakelian to O'Day. We find support for this in *State of Arizona v. Hendrix*, 56 Ariz. 342, 107 P.2d 1078 (1940), in which books were sold to the State of Arizona, "f.o.b. cars at a central depot Chicago." The court held:

Under these contracts the books became the property of the state when delivered to the carrier at any central depot in Chicago. The state became responsible for transportation charges from point of delivery to point of destination and if the books were lost or destroyed in transit the loss would be the state's. When parties have agreed, as here, that the seller may ship from a central depot in a given city, a delivery by the seller to a carrier at such a depot is a delivery to the buyer and constitutes full performance of the seller's obligation to make delivery, and in such case the delivery passes the title to the buyer and the risk of loss or injury in transit is on the buyer. (56 Ariz. at 346, 347, 107 P.2d at 1080)

For the purpose of satisfying subparagraph C(3) of the statute of frauds, we find the lettuce was "received" by O'Day when it was shipped in accordance with each of the invoices. We turn then to whether O'Day "accepted" the lettuce. "Acceptance" is defined in A.R.S. § 44-2369.[1] The lettuce is deemed to have been "accepted" by O'Day because (1) the transfer of the lettuce to the carrier was "an act inconsistent with the seller's ownership," and (2) O'Day failed "to make an effective rejection" of the lettuce after it was received.

The factual link giving rise to enforceable lettuce contracts against O'Day is the apparent agency of Kirchberg. Once we have determined that Kirchberg had the power to bind O'Day to the lettuce purchases, we find that performance of the contracts by Arakelian is amply demonstrated by the delivery of the lettuce in accordance with each invoice. For these reasons we must sustain the judgment of the trial court against O'Day for the full contract price of each of the 20 lettuce shipments.

■ Finally, O'Day argues that it was entitled to summary judgment on its motion prior to trial. Since the motion was denied by the court, it became moot as a legal issue when the case was presented at trial. *Navajo Freight Lines, Inc. v. Liberty Mutual Ins. Co.*, 12 Ariz.App. 424, 471 P.2d 309 (1970). We therefore find it unnecessary to review the issue on appeal.

Judgment affirmed.

OGG, P. J., and DONOFRIO, J., concur.

1. A.R.S. § 44-2369 reads as follows:
A. Acceptance of goods occurs when the buyer:

1. After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

2. Fails to make an effective rejection (subsection A of § 44-2365), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

3. Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

B. Acceptance of a part of any commercial unit is acceptance of that entire unit.